SEND
ENTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ELIAS IATRIDIS, | ) | No. CV 05-5264-RC |
| | ) | |
| Plaintiff, | ) | |
| | ) | OPINION AND ORDER |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Elias Iatridis filed a complaint on July 21, 2005, seeking review of the Commissioner's decision denying his application for disability benefits.  The Commissioner answered the complaint on December 27, 2005, and the parties filed a joint stipulation on May 12, 2006.

**BACKGROUND**

**I**

On February 10, 2000, plaintiff applied for disability benefits

---

[1]  Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted as the defendant in the action.

under Title II of the Social Security Act ("the Act"), 42 U.S.C. §
423, claiming an inability to work since May 11, 1995,[2] due to
multiple injuries and surgeries.[3]   Certified Administrative Record
("A.R.") 97-99, 202.  On February 8, 2002, plaintiff applied for
disability benefits under the Supplemental Security Income ("SSI")
program of Title XVI of the Act, 42 U.S.C. § 1382(a).  A.R. 9, 21.
Administrative Law Judge Charles E. Stevenson ("the ALJ") held an
administrative hearing on June 26 and August 27, 2002.  A.R. 81, 1429-
1504.  On September 27, 2002, the ALJ found plaintiff is not entitled
to Title II benefits, since he was not disabled prior to December 31,
1996, the date he was last insured for Title II purposes, but is
disabled for SSI purposes as of February 8, 2002, the date he filed
his SSI application.[4]  A.R. 17-33.  The plaintiff appealed this
decision to the Appeals Council, which denied review on May 17, 2005.
A.R. 11-16.  The matter before this Court focuses upon whether
plaintiff became disabled prior to December 31, 1996, the date he was
last insured for Title II purposes.

---

[2]  Plaintiff initially claimed he became disabled on
March 1, 1995, A.R. 97, but subsequently amended the date to
May 11, 1995.  A.R. 57-59, 199-200, 1484.

[3]  The plaintiff's application was initially denied on
May 26, 2000, and was denied again on September 12, 2000,
following reconsideration.  A.R. 72-80.

[4]  "Title II is an insurance program.  Enacted in 1935, it
provides old-age, survivor, and disability benefits to insured
individuals irrespective of financial need.  Title XVI is a
welfare program.  Enacted in 1972, it provides SSI benefits to
financially needy individuals who are aged, blind, or disabled
regardless of their insured status."  Bowen v. Galbreath, 485
U.S. 74, 75, 108 S. Ct. 892, 893, 99 L. Ed. 2d 68 (1988)
(citations omitted).

**II**

The plaintiff was born in Athens, Greece, on June 19, 1954, and is currently 53 years old. A.R. 95, 97, 848. He has attended three years of college, and has previously worked as a restaurant manager, cook, factory worker, and banquet server. A.R. 203, 208, 226-33.

On May 11, 1995, plaintiff sustained a work-related injury when he was struck by an electric truck and knocked to the ground.[5] A.R. 289, 293, 323-24, 359, 1461. The plaintiff was further injured in a motor vehicle accident that occurred on July 31, 2000.[6] A.R. 842.

The plaintiff was initially examined following the accident on May 11, 1995, by J. Barnard, M.D., who diagnosed him as having an acute left knee sprain and contusion. A.R. 289-91. Lower back x-rays revealed lumbar degenerative changes, while left knee x-rays were normal. A.R. 289. Dr. Barnard released plaintiff to return to work at modified duties of no prolonged standing or walking effective May 12, 1995, and released him to return to work at regular duties effective May 22, 1995. Id.

On May 19, 1995, plaintiff was examined at the HealthCare Occupational Medical Clinic, where he was diagnosed with left knee

---

[5] Although plaintiff also has significant mental and cardiac impairments, and had coronary artery bypass surgery on December 5, 1994, see A.R. 506-671, this opinion focuses on plaintiff's orthopedic impairments.

[6] Since it is clear that this accident worsened plaintiff's many orthopedic complaints, the decision does not discuss plaintiff's medical tests and treatment after July 31, 2000.

internal derangement and a left shoulder sprain, placed off work for several days, and referred for physical therapy.  A.R. 292. Similarly, on May 23, 1995, Jeffrey Litow, M.D., examined plaintiff and diagnosed him with left knee internal derangement and a left shoulder sprain, and placed him off work for 7 days.  A.R. 293.

On June 14, 1995, Stephen W. Limburg, D.O., examined plaintiff and diagnosed him with a lumbar spine musculoligamentous strain, a left shoulder contusion and strain, and a left knee abrasion, contusion, and strain.  A.R. 323-27.  Dr. Limburg opined plaintiff was temporarily totally disabled, prescribed a cane, a knee support, and medication for plaintiff, and recommended plaintiff continue physical therapy.  Id.  A lumbar spine MRI taken August 11, 1995, showed a diffuse 2 mm. disc bulge at L5-S1 and mild degenerative changes in the lumbar vertebral bodies, A.R. 319, 321, and on September 6, 1995, Dr. Limburg diagnosed plaintiff with a lumbar spine disc protrusion at L5-S1, with radiculopathy,[7] a left shoulder sprain, and a left knee abrasion/contusion and strain.  A.R. 316-18.  On September 8, 1995, plaintiff had a left shoulder MRI, which showed moderate hypertrophy[8] of the left acromioclavicular joint, resulting in moderate encroachment upon the rotator cuff, and findings consistent with tendinitis, with a small tear of the supraspinatus tendon.  A.R. 315. On November 17, 1995, plaintiff had a left knee MRI, which showed a

[7]  Radiculopathy is "disease of the nerve roots."  Dorland's Illustrated Medical Dictionary, 1511 (29th ed. 2000).

[8]  Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells."  Dorland's Illustrated Medical Dictionary at 859.

small effusion tear within the left knee bursa and an oblique tear of

the posterior horn of the medial meniscus.  A.R. 311.  On February 21,

1996, Dr. Limburg opined plaintiff required surgery for his left knee

and left shoulder, and any continued delay in authorizing left knee

surgery increased the risk plaintiff would develop traumatic

arthritis.  A.R. 304, 1255.  Dr. Limburg continued to treat plaintiff

through October 9, 1996, with plaintiff remaining temporarily totally

disabled throughout this time.  A.R. 297-322, 1255-57.


     On July 25, 1995, Farid A. Mostamand, M.D., examined plaintiff,

diagnosed him with sprains/strains of the left shoulder, lumbar spine,

and left knee, prescribed physical therapy for plaintiff, and placed

him off work until August 20, 1995.  A.R. 295.  Dr. Mostamand

reexamined plaintiff on September 20, 1995, and found plaintiff's MRI

showed encroachment of the left rotator cuff and lumbar muscle spasm.

A.R. 294.


     On June 12, 1996, Larry A. Danzig, M.D., an agreed medical

examiner,[9] examined plaintiff and diagnosed him as having low back

pain from a 2 mm. disc bulge at L5-S1, left shoulder impingement

syndrome with a questionable tear of the supraspinatus tendon, and a

left knee sprain with a questionable tear of the left medial meniscus.

A.R. 355-92.  Left shoulder x-rays showed slight to moderate spurring

of the acromioclavicular joint, left knee x-rays showed no osseous

---

     [9]  Under California workers' compensation law, an "agreed
medical examiner [is] chosen by the parties because of his
expertise and neutrality."  Power v. Workers' Comp. Appeals Bd.,
179 Cal. App. 3d 775, 782, 224 Cal. Rptr. 758 (1986).

abnormalities and a metal clip over the medial aspect of the left knee in the soft tissue, and lumbosacral spine x-rays showed slight narrowing of the L5-S1 disc space.  A.R. 383.  Dr. Danzig opined it was medically reasonable for plaintiff to undergo left shoulder and left knee surgery, and if plaintiff declined the surgeries he would be permanent and stationary,[10] with prophylactic preclusions from heavy lifting, repetitive bending and stooping,[11] prolonged weight bearing, repetitive climbing, squatting and kneeling, and work above shoulder level with the left upper arm.  A.R. 386-89.

On January 6, 1997, Dr. Danzig reevaluated plaintiff and ordered new MRIs of his left shoulder and left knee.  A.R. 343-50.  On January 9, 1997, plaintiff had a left knee MRI, which showed small joint effusion and Grade I-II meniscal degeneration, with no evidence of a definite meniscal tear.  A.R. 340-41.  That same day, plaintiff had a left shoulder MRI, which showed moderate acromioclavicular hypertrophy, with subacromial spurring impressing upon the superior

_____

[10]  "A disability is considered 'permanent and stationary' for workers' compensation purposes 'after the employee has reached maximum medical improvement or his or her condition has been stationary for a reasonable period of time.'"  Booth v. Barnhart, 181 F. Supp. 2d 1099, 1103-04 n.3 (C.D. Cal. 2002) (citations omitted); Robertson v. Workers' Comp. Appeals Bd., 112 Cal. App. 4th 893, 897, 5 Cal. Rptr. 3d 485 (2003).

[11]  Under the version of California's workers' compensation guidelines then in effect, a disability precluding heavy lifting and repeated bending and stooping "contemplates the individual has lost approximately half of his pre-injury capacity for lifting, bending and stooping."  Schedule for Rating Permanent Disabilities, Spine and Torso Guidelines, 2-14 (Labor Code of California).  The Schedule for Rating Permanent Disabilities was revised effective April 1997 and January 2005.

surface of the supraspinatus tendon with the arm in neutral position, and Grade I tendinopathy of the rotator cuff, without evidence of a full thickness tear.  A.R. 338-39, 1322-23.  On January 20, 1997, Dr. Danzig opined it was medically reasonable for plaintiff to have left shoulder arthroscopy and subacromial decompression, and again opined that if plaintiff elected not to have surgery he was permanent and stationary with the same work restrictions as set forth on June 12, 1996.  A.R. 331-37.  On March 3, 1997, Dr. Danzig opined plaintiff was a candidate for left knee arthroscopic surgery.  A.R. 329-30.

On March 20, 1997, Alan H. Beyer, M.D., examined plaintiff and found plaintiff's MRI clearly showed a tear of the posterior horn of the medial meniscus and plaintiff required left knee arthroscopy. A.R. 451-68.  On April 8, 1997, Dr. Beyer also recommended plaintiff undergo left shoulder acromioplasty.[12]  A.R. 445-46.  On April 4, 1997, plaintiff underwent a left knee arthroscopy and debridement,[13] A.R. 444, 1325, and on April 8, 1997, plaintiff started physical therapy for his left knee.  A.R. 444.  On April 30, 1997, Dr. Beyer performed a left shoulder open acromioplasty and rotator cuff repair. A.R. 394-405, 1324, 1329.  Dr. Beyer continued to treat plaintiff, who

---

[12]  Acromioplasty is "surgical removal of the anterior hook of the acromion [the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder] to relieve mechanical compression of the rotator cuff during movement of the glenohumeral joint." Dorland's Illustrated Medical Dictionary at 21.

[13]  Debridement is "the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed."  Dorland's Illustrated Medical Dictionary at 460.

received physical therapy.  A.R. 409-10, 414-35.  On October 20, 1997,
Dr. Beyer discharged plaintiff from formal physical therapy, but
opined plaintiff still could not return to work because of his back
problems.  A.R. 423.

    On June 23, 1997, Jacobo W. Chodakiewitz, M.D., a neurosurgeon,
examined plaintiff and diagnosed him as having left
hemihypoesthesia,[14] left L5-S1 radiculopathy, and left C6-C8
radiculopathy.  A.R. 1005-09.  On June 27, 1997, plaintiff had a
lumbar spine MRI, which showed L4-L5 disc dessication, with mild
broad-based 2-3 mm. disc bulge resulting in mild impression upon the
thecal sac and mouth of the right and left neural foramina, and
congenital narrowing of the L5-S1 disc and minimal 1.5 mm. posterior
bulging of the disc.  A.R. 999-1000, 1003-04.  A cervical spine MRI
taken the same day showed mild-to-moderate 3 mm. disc bulging
posteriorly to the right at C3-C4, resulting in localized encroachment
upon the right anterior aspect of the thecal sac and the mouth of the
right neural foramen, and moderate 3-4 mm. protrusion of the disc
posteriorly to the right at C5-C6, resulting in moderate encroachment
upon the right anterior aspect of the thecal sac and abutment of the
cord, as well as mild encroachment upon the mouth of the right neural
foramen.  A.R. 1001-02, 1327-28.  An electromyogram ("EMG") performed
July 14, 1997, revealed increased irritability in the L5 myotomes,[15]

---

[14]  Hemihypoesthesia is abnormal decreased sensitivity,
particularly to touch, on one side of the body.  Dorland's
Illustrated Medical Dictionary, 800, 863 (29th ed. 2000).

[15]  A myotome is "a group of muscles innervated from a
single spinal segment."  Dorland's Illustrated Medical Dictionary
at 1172.

left greater than right, and root irritation at the foraminal level.
A.R. 998, 1326.  On July 16, 1998, plaintiff had a lumbar spine MRI,
which showed 3-4 mm. diffuse posterior disc herniations encroaching on
the dural sac at L3-L4 and L4-L5, with compromise of the nerve roots
in their lateral recesses and neural foramina, and encroachment on the
dural sac at L5-S1.  A.R. 977-78.  On March 13, 1999, plaintiff had a
lumbar spine CT scan, which showed a 1-2 mm. diffuse broad-based
posterior disc bulge at L3-L4, with mild degenerative changes in the
facet joints bilaterally, a 2-3 mm. diffuse broad-based posterior disc
bulge effacing the thecal sac at L4-L5, with moderate degenerative
changes in the facet joints bilaterally, and a 1-2 mm. central
posterior disc bulge effacing the thecal sac at L5-S1.  A.R. 963-64.
On March 17, 2000, plaintiff had a cervical discogram and cervical
spine CT scan, which showed an abnormal discogram at C5-C6 with too
little contrast to interpret the C3-C4 disc.  A.R. 928-33.

     On May 18, 2001, Dr. Chodakiewitz opined that since January 1,
1999:  plaintiff could occasionally lift and/or carry up to 5 pounds;
could sit for 3 hours; could stand and walk for 30 minutes each;
needed to rest for 4 hours in an 8-hour day; could not use his arms
for repetitive activities; could not bend, squat, crawl, climb, or
reach; was totally restricted from being around moving machinery and
being exposed to marked changes in temperature and humidity; was
moderately limited in working at unprotected heights and driving
automotive equipment; and was mildly limited from exposure to dust,
fumes and gases.  A.R. 1039.  On September 6, 2001, Dr. Chodakiewitz
clarified his opinion, stating the foregoing limitations have been
present since plaintiff was injured on May 11, 1995.  A.R. 1151.

1    On October 20, 1997, Myron Koch, M.D., examined plaintiff,
2    diagnosed him with low back, left shoulder, and left knee strains, and
3    opined "there is some suggestion of a chronic dysfunctional pain
4    syndrome. . . ."  A.R. 1017-28.  Bilateral knee x-rays showed a
5    vascular clip in the superficial venous region medially about the left
6    knee, and cervical spine x-rays revealed multiple areas of
7    degenerative changes at C4-C5, C5-C6 and C6-C7 consisting of an
8    anterior ligament that is undergoing ossification with small posterior
9    osteophytes consistent with degenerative changes and mid-cervical
10   scoliosis convex to the right and uncinate process hypertrophy, which
11   is most prominent at C4.  A.R. 1026.  Pelvic x-rays showed spina
12   bifida occulta[16] at S1 and an anomalous formation of lamina at L5,
13   commonly associated with spondylolysis,[17] and lumbar spine x-rays
14   showed marginal osteophytes at L4 and L5, slight narrowing of the
15   lumbosacral space and the L4 disc space and no forward displacement of
16   L4 on L5 or L5 on S1, with changes most consistent with secondary
17   degenerative changes of spondylolysis.  Id.  Left shoulder x-rays
18   showed some irregularities at the left acromioclavicular joint, with a
19   suspected partial resection at the distal end of the clavicle.  Id.
20   //

21   _____

22       [16]  Spina bifida occulta is "a developmental anomaly
     characterized by defective closure of the vertebral arch" without
23   protrusion of the spinal cord or meninges.  Dorland's Illustrated
     Medical Dictionary at 1677.
24

25       [17]  Spondylolysis is the "dissolution of a vertebra; a
     condition marked by platyspondylia [congenital flattening of the
26   vertebral bodies], aplasia [lack of development of an organ or
     tissue] of the vertebral arch, and separation of the pars
27   interarticularis [the part of the lamina between the superior and
     inferior articular processes of a lumbar vertebra]."  Dorland's
28   Illustrated Medical Dictionary at 113, 1328, 1401, 1684.

On January 22, 1998, Stuart A. Green, M.D., an agreed medical
examiner, examined plaintiff and diagnosed him with resolved internal
derangement of the left knee and cervical and lumbar sprains.  A.R.
477-502.  Cervical spine x-rays revealed anterior osteophytes at C5-C6
and C6-C7.  A.R. 497.  Dr. Green opined plaintiff was permanent and
stationary as of December 19, 1997, and he should be limited to
moderate work and light lifting with his left upper arm, no use of his
left arm at or above nipple level, and only very light pushing or
pulling with the left shoulder.  A.R. 499-500.  Dr. Green reexamined
plaintiff on December 3, 1998, and opined that Dr. Chodakiewitz's
recommendations for cervical and lumbar surgeries should be authorized
although plaintiff "may be worse of[f] after the operation than he is
now."  A.R. 470-76.

On December 8, 1998, Isaac Schmidt, M.D., an orthopedic surgeon,
examined plaintiff and diagnosed him with a lumbar spine sprain/
strain, L3-L4 and L4-L5 disc disease, and left L5 radiculopathy.  A.R.
892-96.  On January 15, 1999, Dr. Schmidt performed L3-L4 and L4-L5
disc excision on plaintiff.  A.R. 731-32, 740-41, 749-50.  On
March 22, 2000, Dr. Schmidt diagnosed plaintiff with cervical and
lumbar spine sprains/strains, L3-L4 disc disease, and left L5
radiculopathy, and recommended plaintiff undergo cervical spine
surgery.  A.R. 883-87.  On March 30, 2000, Dr. Schmidt performed a
C3-C4 and C5-C6 disc excision and fusion with instrumentation on
plaintiff.  A.R. 707, 720, 722-23, 925.  On May 12, 2000, Dr. Schmidt
reevaluated plaintiff and diagnosed him with cervical and lumbar
sprains/strains, L3-L4 and L4-L5 disc disease, and left L5
radiculopathy.  A.R. 874-77.  On July 26, 2000, plaintiff underwent a

11

left shoulder MRI, which showed thinning of the rotator cuff, with superior migration of the humeral head, an intermediate signal within the rotator cuff and irregularity consistent with degeneration and/or tendinosis, and a lateral downslope of a small residual acromion process.  A.R. 866-67.

On December 8, 1998, plaintiff underwent an EMG and nerve conduction studies, which showed abnormal nerve conduction velocities of the left lower leg and borderline nerve conduction velocities of the right lower leg, and the EMG showed evidence of chronic L4, L5 and S1 radiculopathy on the left, but superimposed polyneuropathy could not be ruled out.  A.R. 1142-44.

Medical expert Alanson A. Mason, M.D., an orthopedic surgeon, testified at plaintiff's administrative hearing, where he stated plaintiff had a decreased capacity for standing and walking because of back and lower extremity pain and, as of December 31, 1996, plaintiff was limited to light work, with no repetitive overhead reaching, pushing or pulling.[18]  A.R. 1432-60, 1484-1503.

---

[18]  Under Social Security regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b), 416.967(b).  "[T]he full range of light work requires standing or walking for up to two-thirds of the workday."  Gallant v. Heckler, 753 F.2d 1450, 1454 n.1 (9th Cir. 1984); SSR 83-10, 1983 WL 31251, *6.

**DISCUSSION**

**III**

The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision regarding plaintiff's application for disability benefits to determine if his findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching his decision. <u>Parra v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007); <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006).

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). "The claimant bears the burden of establishing a prima facie case of disability." <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1122 (1996); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289 (9th Cir. 1996). In this case, since plaintiff's Title II insured status expired on December 31, 1996, A.R. 32, plaintiff must prove he was either permanently disabled or subject to a condition which became so severe as to disable him prior to that date. <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998); <u>Armstrong v. Comm'r of the Soc. Sec. Admin.</u>, 160 F.3d 587, 589 (9th Cir. 1998).

The Commissioner has promulgated regulations establishing a five-step sequential evaluation process for the ALJ to follow in a disability case. 20 C.F.R. § 404.1520. In the **First Step**, the ALJ

must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If not, in the **Second Step**, the ALJ must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities.  20 C.F.R. § 404.1520(c).  If so, in the **Third Step**, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1.  20 C.F.R. § 404.1520(d).  If not, in the **Fourth Step**, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work.  20 C.F.R. § 404.1520(f).  If not, in **Step Five**, the burden shifts to the Commissioner to show the claimant can perform other work that exists in significant numbers in the national economy.  20 C.F.R. § 404.1520(g).

Applying the five-step sequential evaluation process, the ALJ found plaintiff has not engaged in substantial gainful activity since February 8, 2002, but made no findings prior to that date.  (Step One).  The ALJ then found plaintiff has severe spinal stenosis and osteoarthritis, with degenerative disc disease and arthrodesis of the left knee; however, he also found that "[t]he medical evidence does not establish that these conditions were severe prior to the date last insured, December 31, 1996[.]"  (Step Two).  The ALJ also found plaintiff did not have an impairment or combination of impairments that met or equaled a Listing prior to December 31, 1996.  (Step Three).  Finally, the ALJ concluded plaintiff "did not have an

1  impairment, or combination of impairments, that would prevent him from

2  returning to his past relevant work as a restaurant manager, prior to

3  December 31, 1996"; therefore, he is not disabled for Title II

4  purposes.  (Step Four).

5

6                                    **IV**

7       A claimant for Title II benefits has the burden to prove he was

8  either permanently disabled or subject to a condition that became so

9  severe as to disable him **prior** to the date his eligibility for Title

10 II benefits expires.  Greger v. Barnhart, 464 F.3d 968, 970 (9th Cir.

11 2006); Armstrong, 160 F.3d at 589.  "[T]he critical date is the date

12 of onset of disability, not the date of diagnosis."  Swanson v. Sec'y

13 of Health & Human Servs., 763 F.2d 1061, 1065 (9th Cir. 1985); Morgan

14 v. Sullivan, 945 F.2d 1079, 1081 (9th Cir. 1991) (per curiam).

15 Moreover, any deterioration in a claimant's condition subsequent to

16 the last date of eligibility for Title II benefits is immaterial for

17 disability purposes.  Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.

18 1995); Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989).

19

20      "The onset date of disability is the first day an individual is

21 disabled as defined in the Act and the regulations."  Social Security

22 Ruling ("SSR") 83-20, 1983 WL 31249, *1 (S.S.A.);[19] Morgan, 945 F.2d

23 ────────────────

24      [19]  Social Security Rulings constitute SSA's interpretations
25 of the statute it administers and of its own regulations.
   Massachi v. Astrue, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007);
26 Ukolov v. Barnhart, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005).
   Although Social Security Rulings do not have the force of law,
27 Chavez v. Dep't of Health & Human Servs., 103 F.3d 849, 851 (9th
   Cir. 1996); Quang Van Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir.
28 1989), once published, they are binding upon ALJs and the

at 1081.  "For disabilities of traumatic origin, onset is the day of
the injury if the individual is thereafter expected to die as a result
or is expected to be unable to engage in substantial gainful activity
. . . for a continuous period of at least 12 months. . . ."  SSR 83-
20, 1983 WL 31249 at *2; McNabb v. Barnhart, 340 F.3d 943, 945 (9th
Cir. 2003).[20]  Moreover, the claimant's alleged onset date "should be
used if it is consistent with all the evidence available"; neverthe-
less, "the established onset date must be fixed based on the facts and
can never be inconsistent with the medical evidence."  SSR 83-20, 1983
WL 31249 at *3; Armstrong, 160 F.3d at 589.

Here, plaintiff sustained a traumatic injury on May 11, 1995,
when he was run over by an electric truck.  A.R. 289, 293, 323-24,
359, 1461.  Nevertheless, the ALJ found plaintiff, as of December 31,
1996, did not have a severe impairment or combination of impairments
(Step Two)[21] and plaintiff retained the residual functional capacity
("RFC")[22] to perform "light exertional work activity, with restriction

Commissioner.  Holohan v. Massanari, 246 F.3d 1195, 1202-03 n.1
(9th Cir. 2001); Gatliff v. Comm'r of the Soc. Sec. Admin., 172
F.3d 690, 692 n.2 (9th Cir. 1999).

    [20]  In disabilities of non-traumatic origin, the claimant's
allegations, his work history, and the medical evidence are all
factors relevant to the determination of disability onset date,
with medical evidence being the most important factor.  SSR 83-
20, 1983 WL 31249 at *2.

    [21]  For the reasons discussed herein, this Step Two finding
was obviously erroneous.  Nevertheless, for purposes of judicial
economy, this opinion focuses on the ALJ's Step Four
determination, rather than his Step Two finding.

    [22]  A claimant's RFC is what he can still do despite his
physical, mental, nonexertional, and other limitations.  Mayes v.
Massanari, 276 F.3d 453, 460 (9th Cir. 2001); Cooper v. Sullivan,

1    against overhead lifting bilaterally[,]" such as his past relevant
2    work as a restaurant manager (Step Four).  A.R. 31-33.  However,
3    plaintiff contends the ALJ's Step Four determination is not supported
4    by substantial evidence because the ALJ failed to properly consider
5    the medical evidence and erroneously determined plaintiff was not a
6    credible witness.  The plaintiff is correct.

7

8        The medical opinions of treating physicians are entitled to
9    special weight because the treating physician "is employed to cure and
10   has a greater opportunity to know and observe the patient as an
11   individual."  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987);
12   Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001); see also 20
13   C.F.R. § 404.1527(d)(2) (generally providing more weight is given to
14   treating sources "since these sources are likely to be the medical
15   professionals most able to provide a detailed, longitudinal picture of
16   your medical impairment(s). . . .").  Therefore, the Commissioner must
17   provide clear and convincing reasons for rejecting the uncontroverted
18   opinion of a treating physician, Bayliss v. Barnhart, 427 F.3d 1211,
19   1216 (9th Cir. 2005); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir.
20   2003), and "[e]ven if [a] treating doctor's opinion is contradicted by
21   another doctor, the ALJ may not reject this opinion without providing
22   'specific and legitimate reasons' supported by substantial evidence in
23   the record."  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998);
24   Bayliss, 427 F.3d at 1216.
25   //
26   //

27   _____

28   880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

17

1    Dr. Chodakiewitz, one of plaintiff's treating physicians,[23]

2   clearly expressed an opinion that plaintiff, as of May 11, 1995:  was

3   limited to occasionally lifting and/or carrying up to 5 pounds,

4   sitting for 3 hours, standing and walking for 30 minutes each, and

5   resting for 4 hours in an 8-hour day; could not use his arms for

6   repetitive activities; could not bend, squat, crawl, climb, or reach;

7   was totally restricted from being around moving machinery and being

8   exposed to marked changes in temperature and humidity; and was

9   "moderately" limited in working at unprotected heights, driving

10  automotive equipment and being exposed to dust, fumes and gases.  A.R.

11  1039, 1151.  The ALJ discounted Dr. Chodakiewitz's opinions because

12  they were set forth on May 18 and September 6, 2001, and the ALJ

13  improperly assumed they related to conditions as of those dates.  A.R.

14  28.  The ALJ committed legal error in rejecting Dr. Chodakiewitz's

15  opinions for the reason he stated because "[r]etrospective diagnoses

16  by treating physicians and medical experts . . . are . . . relevant to

17  the determination of a continuously existing disability with onset

18  prior to expiration of insured status."  Flaten v. Sec. of Health &

19  Human Servs., 44 F.3d 1453, 1461 n. 5 (9th Cir. 1995); see also Lester

20

21        [23]  The ALJ's finding that Dr. Chodakiewitz was not a
    treating physician, A.R. 28, is not supported by substantial
22  evidence given the numerous occasions on which Dr. Chodakiewitz
    examined plaintiff, prescribed medication to him, and referred
23  plaintiff for diagnostic testing and further treatment, as well
    as Dr. Chodakiewitz's participation in plaintiff's lumbar spine
24  surgery.  A.R. 707, 731-32, 908-1012, 1090-93, 1201-07, 1261-68;
    see 20 C.F.R. §§ 404.1502, 416.902 (A treating physician is any
25  physician who "has provided [the claimant] with medical treatment
    or evaluation and who has, or has had, an ongoing treatment
26  relationship with [the claimant]."); Ghokassian v. Shalala, 41
    F.3d 1300, 1303 (9th Cir. 1994) (holding physician who saw
27  claimant twice within a 14-month period and prescribed medication
    to him is treating physician).
28

1  v. Chater, 81 F.3d 821, 832 (9th Cir. 1995) ("'[M]edical evaluations

2  made after the expiration of a claimant's insured status are relevant

3  to an evaluation of the preexpiration condition.'" (citation

4  omitted)).

5

6       The also rejected Dr. Chodakiewitz's opinions on the ground Dr.

7  Chodakiewitz, as a workers' compensation physician, was required to

8  "attribute[] everything to the May 11, 1995, injury . . . for workers'

9  compensation to pay the bills." A.R. 27.  However, "in the absence of

10 other evidence to undermine the credibility of a medical report, the

11 purpose for which the report was obtained does not provide a

12 legitimate basis for rejecting it."  Reddick, 157 F.3d at 726; see

13 also Batson v. Comm'r of the Soc. Sec. Admin., 359 F.3d 1190, 1196 n.5

14 (9th Cir. 2004) (rejecting claimant's claim physician was biased

15 because he was hired by workers' compensation insurance company).

16 Since this reason, too, is not a proper ground to reject Dr.

17 Chodakiewitz's opinions,[24] the ALJ failed to provide specific and

18 ────────────────

19      [24]  Moreover, Dr. Limburg, who treated plaintiff between
   June 14, 1995, and October 9, 1996, opined plaintiff was
20 temporarily totally disabled throughout that period.  A.R. 297-
   314.  Under California workers' compensation terminology, "[t]he
21 term 'temporarily totally disabled' means that an individual is
   'totally incapacitated' and 'unable to earn any income during the
22 period when he is recovering from the effects of the injury.'"
   Booth, 181 F. Supp. 2d at 1103 n.2 (citation omitted); Rissetto
23 v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600, 605 (9th
   Cir. 1996); Herrera v. Workmen's Comp. Appeals Bd., 71 Cal. 2d
24 254, 257, 78 Cal. Rptr. 497, 499 (1969); see also Robinson v.
   Workers' Comp. Appeals Bd., 194 Cal. App. 3d 784, 792, 239 Cal.
25 Rptr. 841 (1987) ("'The period of temporary total disability is
   that period when the employee is totally incapacitated for work
26 and during which he may reasonably be expected to be cured or
   materially improved with proper medical attention[,]' or until
27 his condition becomes permanent and stationary." (citations
28

                                  19

1   legitimate reasons for not considering Dr. Chodakiewitz's limitations.

2   Thus, the ALJ's Step Four determinations that plaintiff was not

3   disabled and was able to perform his past relevant work as a

4   restaurant manager prior to December 31, 1996, are not supported by

5   substantial evidence.

6

7                                    V

8       This Court has discretion to award disability benefits to a

9   plaintiff when there is no need to remand the case for additional

10  factual findings.  McCartey v. Massanari, 298 F.3d 1072, 1076 (9th

11  Cir. 2002); Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).

12  Generally, the Court will direct the award of benefits in cases where

13  the record has been fully developed and where further administrative

14  proceedings would serve no useful purpose.  McCartey, 298 F.3d at

15  1076-77; Vertigan v. Halter, 260 F.3d 1044, 1053 (9th Cir. 2001).

16

17      "Where the Commissioner fails to provide adequate reasons for

18  rejecting the opinion of a treating . . . physician, [this Court]

19  credit[s] that opinion 'as a matter of law.'"  Lester, 81 F.3d at 834

20  (quoting Hammock v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989)).  Here,

21  vocational expert Stephen Berry testified that an individual, such as

22  plaintiff, who is required to rest for 4 hours out of an 8-hour work

23  day could **not** perform any work in the national economy.  A.R. 1477.

24  Therefore, crediting Dr. Chodakiewitz's opinions as true, as well as

25

26  ───────────────

27  omitted)).  Dr. Limburg's opinion that plaintiff could not work
    between June 5, 1995, and October 9, 1996, provides further
    support for a May 11, 1995 onset date, and the ALJ also erred in

28  failing to consider this aspect of Dr. Limburg's opinion.

1 | the other overwhelming evidence, plaintiff's disability onset date is

2 | May 11, 1995, the date of his traumatic injury, SSR 83-20, 1983 WL

3 | 31249 at *2, and he is entitled to Title II benefits.[25]

4

5 | **ORDER**

6 |      IT IS ORDERED that plaintiff's request for relief be granted, and

7 | the Commissioner shall award Title II disability benefits to plaintiff

8 | under 42 U.S.C. § 423.

9

10 | DATE:   July 6, 2007                    /s/ Rosalyn M. Chapman

                                      ROSALYN M. CHAPMAN

11                                    UNITED STATES MAGISTRATE JUDGE

---

[25]   Having reached this conclusion, it is unnecessary to reach the other issue plaintiff raises.

R&R-MDO\05-5264.mdo
7/6/07

21